# UNITED STATES COURT OF APPEALS

## FOR THE FIFTH CIRCUIT

---
No. 98-30935
---

D.C. Docket No. 97-CV-1234

U.S. COURT OF APPEALS
**FILED**

**JAN 1 0 2000**

CHARLES R. FULBRUGE III
CLERK

HELEN SIMPSON

      Plaintiff - Appellee

**FILED**
USDC, WESTERN DISTRICT OF LA
ROBERT H. SHEMWELL, CLERK
DATE 2 3 00
BY

  v.

CITY OF SHREVEPORT

      Defendant - Appellant

Appeal from the United States District Court for the
Western District of Louisiana, Shreveport.

Before GARWOOD, SMITH, and BENAVIDES, Circuit Judges.

### J U D G M E N T

This cause came on to be heard on the record on appeal and
was argued by counsel.

ON CONSIDERATION WHEREOF, it is now here ordered and adjudged
by this Court that the judgment of the District Court in this cause
is affirmed.

IT IS FURTHER ORDERED that defendant-appellant pay to
plaintiff-appellee the costs on appeal to be taxed by the Clerk
of this Court.

ISSUED AS MANDATE:

FEB 0 1 2000

A true copy
Test
Clerk, U.S. Court of Appeals, Fifth Circuit
By
Deputy
New Orleans, Louisiana

COPY SENT
DATE 2/3/00
BY
TO:

UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

U.S. COURT OF APPEALS
**FILED**

JAN. 1 0 2000

CHARLES R. FULBRUGE III
CLERK

---

No. 98-30935

---

HELEN SIMPSON,

Plaintiff-Appellee,

versus

CITY OF SHREVEPORT,

Defendant-Appellant.

---

Appeal from the United States District Court for the Western
District of Louisiana

---

Before GARWOOD, SMITH, and BENAVIDES, Circuit Judges.

BENAVIDES, Circuit Judge:[*]

This discrimination case involves the appeal of the denial of a motion for judgment as a matter of law pursuant to Rule 50 of the Federal Rules of Civil Procedure. Finding a legally sufficient evidentiary basis to support the jury's verdicts of constructive discharge and retaliation, we affirm.

I.    FACTUAL AND PROCEDURAL HISTORY

In March of 1992, Helen Simpson (Simpson) began working for the defendant, City of Shreveport (the City), as an

---

[*]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

operator/collector in the waste division of the Public Works Department. As an operator/collector, she drove garbage trucks and threw refuse onto the trucks. In November of 1993, she was promoted to supervisor in the waste division. She was the only female among thirteen supervisors in that division. From the time she was promoted until she made a sexual harassment complaint to the City in February of 1995, Simpson's fellow supervisors and her immediate supervisor, Milton Chambers, made lewd sexual comments daily in her presence.[1] Prior to making that complaint Simpson asked Chambers to stop the harassment. He had a meeting with the men harassing her, but because of Chambers' own involvement in the sexual banter Simpson did not believe that Chambers took the complaint seriously. Simpson also had private conversations with two of the men in an effort to stop the harassment to no avail.

On February 16, 1995, Simpson met with John Bonanno, a personnel analyst with the City. She reported that she was being harassed by her immediate supervisor, Chambers, and several co-workers, Kenneth Butler, Paul Stephens, William Flakes and Greg Cooper. At this meeting, Simpson showed Bonanno a journal she had kept of the sexual comments made by her supervisor and co-workers. Bonanno made a copy of several of the pages. He assured Simpson that he would investigate the allegations and take steps to end the harassment. He also inquired whether she felt threatened and wanted to be removed from that environment, to which she responded

---

[1]    In light of the fact that the City does not appeal the jury's finding of sexual harassment, we do not see the need to list the many crude remarks and actions that were testified to at trial.

that she just wanted the harassment to stop.

The next day, Bonanno called the Director of Public Works, Tom Dark, who scheduled a meeting with each of the alleged harassers. They were informed of the accusations against them, warned that any such behavior should cease immediately, and instructed not to discuss the matter with Simpson (or anyone else) or retaliate against her.

Bonanno met with Simpson and advised her that the men had made allegations against her concerning sexual banter in the workplace. Although she denied some of the allegations, she admitted that in anger she had responded to some of the men's sexually explicit comments in kind.  At the conclusion of the meeting, Bonanno advised Simpson that both she and the men she accused had participated in sexual harassment.  He informed her that the investigation was closed and asked her to sign a piece of paper. Pursuant to his direction, she wrote, in pertinent part, "[t]his investigation has been done to my satisfaction. [signed] Helen Simpson."

Bonanno then sent a confidential memo to Dark, outlining his findings and recommending that a letter of instruction be sent to all parties.  Based on this recommendation, Simpson and all of the men she accused of harassing her received a letter of instruction regarding sexual harassment from Dark.  Additionally, all of the parties were specifically instructed to stop the offending behavior and provided with a copy of the City's harassment policy, which they were to read.

The next day Simpson informed Bonanno that she wanted to re-

3

open the case because she was not satisfied with the investigation. He responded that the investigation had been completed, but that if she had something new, he would hear it. He also gave her a copy of the City's grievance procedure and told her she could appeal. Simpson admitted there was less sexual harassment after the investigation.

After having made the complaint of sexual harassment in February of 1995, she experienced many acts of retaliation from Chambers and her co-workers until she resigned in November of 1996. Meanwhile, on May 6, 1996, Simpson hurt her back lifting a refrigerator on the job. During the next six months she was at work only 12 full days. On her last full day of work, Chambers disciplined her for not communicating with him. She denied the charge, but was written up based on that accusation. Approximately two weeks later she resigned her employment. On the advice of her family, she made a request to rescind her resignation, which was denied.

Simpson filed suit against the City, seeking compensatory damages under Title VII on the grounds of sexual harassment, racial discrimination, constructive discharge, and retaliation. The case was tried before a jury. Pursuant to Rule 50, the City moved for judgment as a matter of law at the close of Simpson's case and at the close of all the evidence. The district court denied the motions from the bench. The jury awarded Simpson a lump sum of $150,000, finding the City liable for sexual harassment,

constructive discharge, and retaliation.[2]  The City now appeals the findings of constructive discharge and retaliation.

II.  ANALYSIS

A.  CONSTRUCTIVE DISCHARGE

The City contends that the district court erred in denying its Rule 50 motion for judgment as a matter of law with respect to Simpson's constructive discharge claim.  This Court reviews *de novo* rulings on Rule 50 motions, using the same standards as those employed by the district court.  *Burch v. Coca-Cola Co.*, 119 F.3d 305, 313 (5th Cir. 1997).  If a party has been fully heard on an issue, a district court may grant an opposing party's motion for judgment as a matter of law if "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue."  Fed.R.Civ.P. 50(a)(1).  This Court reviews the entire trial record in the light most favorable to the non-movant, drawing reasonable factual inferences in its favor.  *Burch*, 119 F.3d at 313.  "The decision to grant a directed verdict . . . is not a matter of discretion, but a conclusion of law based upon a finding that there is insufficient evidence to create a fact question for the jury."  *Id.* (internal quotation marks and citations omitted).  "If the facts and inferences point so strongly and overwhelmingly in favor of the moving party . . . that reasonable jurors could not have arrived at a contrary verdict, then we will conclude that the motion should have been granted."  *Id.*

Constructive discharge may form the basis of a Title VII

_____

[2]  The jury rejected her claim of racial discrimination.

claim.  *Ward v. Bechtel Corporation,* 102 F.3d 199, 202 (5th Cir. 1997).  "'To show constructive discharge, an employee must offer evidence that the employer made the employee's working conditions so intolerable that a reasonable employee would feel compelled to resign.'" *Id.* (quoting *Barrow v. New Orleans S.S. Ass'n,* 10 F.3d 292, 297 (5th Cir. 1994)).

The test is objective, looking to whether a reasonable employee would have felt compelled to resign.  *Barrow,* 10 F.3d at 297 n. 19.  Whether a reasonable employee would feel compelled to resign is fact-dependent.  However, we have stated that whether the employee experienced any of the following is relevant to the determination:    (1) demotion;    (2) reduction in salary;    (3) reduction in job responsibilities;    (4) reassignment to menial or degrading work;    (5) badgering, harassment, or humiliation by the employer calculated to encourage the employee to resign.  *Barrow,* 10 F.3d at 297.  The list is not exclusive.  *Id.*

The City argues that Simpson failed to show constructive discharge because her sexual harassment claim was properly resolved, and she never complained of continuing sexual harassment.  Thus, the City argues, any suggestion that her resignation was somehow triggered by sexual harassment that was reported and addressed 18 months earlier is simply too attenuated to support any legal inference connecting the two events.

We see two problems with the City's argument.  First, the City's assertion that Simpson's sexual harassment claim was properly resolved ignores the jury's finding of sexual harassment, a verdict the City did not appeal.  Indeed, in the special

6

interrogatories, the jury expressly answered "no" to the following question: "Do you find . . . that [the City] promptly and reasonably investigated plaintiff's sexual harassment complaints and took prompt and reasonable remedial action?"  We therefore must reject the assertion that the City properly addressed and resolved Simpson's sexual harassment complaint.[3]

Second, the City focuses solely on the evidence of sexual harassment to argue there was an insufficient evidentiary basis to support a verdict of constructive discharge.  This argument overlooks Simpson's evidence of retaliation.  At trial, Simpson testified that Chambers and Cooper warned her "not to tell about the things that [were] going on in the office or [she] would find [herself] out of a job, find [herself] at home, wondering why [she] was not working."  Chambers changed Simpson's route and made it difficult for her to leave work to see her physician.  On the last day that Simpson actually worked, Chambers disciplined her for not communicating with him, a charge she denied.  In relation to that disciplinary action, Chambers told Stephens "I f[---]ed her once again," and "[y]ou should have seen the look on that bitch's face when she got that write-up, when she got that letter of warning, which really was a write-up and this is strike three against her."

Simpson also testified that Chambers "put [her] crews on trucks with the bed coming loose from the frames.  Some of them didn't have brakes."  She was not given enough trucks or drivers to

---

[3] We also note that during oral argument counsel for the City conceded that a reasonable jury could have found that Simpson was sexually harassed.

7

perform her job.  On numerous occasions, someone hid the keys to her truck, deflated her truck's tires, threw away her gas cards, and locked the doors to her truck while the engine was running.

In addition to the above retaliatory acts, there were threats of violence directed at Simpson.  Flakes and Cooper indicated that if there were charges lodged against them, they would "spray her house," which she understood to mean a drive-by shooting.  Cooper threatened Simpson by telling her that he kept a gun on the job.  Butler informed her that if anyone caused him to receive another "write-up," he would "beat their ass" if he caught them off the compound.  Stephens told her "he would do a 'post office' on her house if someone wrote him up."  Those types of threats continued until she left employment with the City.

The evidence that Simpson's supervisor purposely did not provide her with enough trucks and changed her truck routes arguably could fall under the fourth factor in *Barrow* regarding reassignment to menial or degrading work.  More importantly, Simpson's evidence regarding the above stated retaliatory acts on the part of her immediate supervisor, Chambers,[4] and her fellow

---

[4]   The City makes no argument on appeal regarding whether Chambers' actual knowledge of the retaliation may be imputed to the City.   Chambers' duties as supervisor included hiring and disciplining employees.   *See Sharp v. City of Houston,* 164 F.3d 923, 929-30 (5th Cir. 1999) (explaining that a "manager" under title VII "includes someone with the power not only to hire and fire the offending employee but also to take disciplinary action").   Moreover, the jury was instructed that the City was responsible for Chambers' conduct regardless of whether the City knew or should have known of the harassment.   The City does not challenge that instruction on appeal.   Thus, for purposes of this appeal, Chambers' knowledge of any harassment or retaliatory conduct may be imputed to the City.

supervisors,[5] constituted badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation, which is the sixth factor in *Barrow*.

To summarize, there is evidence that Simpson experienced severe and constant sexual harassment from November of 1993 (when Simpson was promoted to supervisor) until February of 1995 (when she filed a complaint with the City). Although the sexual harassment became less frequent after the investigation, it did not completely cease. After Simpson made her complaint of sexual harassment, Chambers and Simpson's co-workers began their retaliatory campaign against her. The evidence indicates that their retaliatory conduct was "calculated to encourage [Simpson's] resignation." *Barrow*, 10 F.3d at 297. Viewed in the light most favorable to Simpson, we conclude that there was a legally sufficient evidentiary basis for a reasonable jury to find that her working conditions were so intolerable that a reasonable employee would have felt compelled to resign.[6] We therefore affirm the

---

[5]   Again, although there is no argument on appeal regarding imputation of knowledge to the City, there was evidence that a co-worker would call Chambers to inquire whether he could "do" certain things to Simpson, such as taking her trucks. The evidence indicated that Chambers talked to one of Simpson's co-workers regarding the goal of forcing Simpson's resignation or termination. Additionally, Chambers and a co-worker told Simpson "not to tell about the things . . . in the office or [she] would find [herself] out of a job." Thus, viewing the record in the light most favorable to Simpson, as we must, there is evidence for a jury to infer that Chambers was aware of the co-workers' retaliatory acts. As previously set forth, Chambers' knowledge of such activities may be imputed to the City.

[6]   The City also argues that because she only worked 12 days in the last six months of her employment and tried to rescind her resignation, her working conditions could not have been intolerable. Again, we must view this evidence drawing inferences

Case 5:97-cv-01234-JMS-RSP   Document 51   Filed 02/03/00   Page 11 of 13   PageID #:  11

district court's denial of the City's Rule 50 motion for judgment
as a matter of law in regard to Simpson's constructive discharge
claim.

B.   RETALIATION

The City next contends that the district court erred in
denying its Rule 50 motion for judgment as a matter of law with
respect to Simpson's claim for retaliation.   As set forth in more
detail above, we review rulings on Rule 50 motions *de novo*.

To demonstrate a claim for retaliation, Simpson must prove (1)
that she engaged in an activity that was protected; (2) an adverse
employment action occurred; and (3) a causal connection existed
between the participation in the activity and the adverse
employment action.   *Webb v. Cardiothoracic Surgery Assoc.*, 139 F.3d
532, 540 (5th Cir. 1998).   Here, we are concerned solely with
ultimate employment decisions.   *Id.*

Simpson correctly asserts that by filing the formal complaint
of sexual harassment with the City she engaged in an activity that
was protected.   *Dollis v. Rubin,* 77 F.3d 777, 781 (5th Cir. 1995)
(explaining that "[t]here can be no question that [the employee's]
retaliation claims satisfy the first element of the analysis,
filing an administrative complaint is clearly protected activity").

in favor of Simpson.   Although she had injured her back, another
reason for her absence from work could have been that she found
these working conditions to be intolerable.   Moreover, on the last
full day she actually worked, Chambers disciplined her for not
communicating with him, a charge she asserts is false.   That
evidence indicates that the disciplinary action was, in effect, the
"last straw" for Simpson.   We are not persuaded that attempting to
rescind one's resignation entitles the City to judgment as a matter
of law.

10

Thus, the first prong is satisfied.

In regard to the second prong, as discussed previously, we have determined that Simpson established a constructive discharge claim, which qualifies as an adverse employment action. *See Sharp v. City of Houston,* 164 F.3d at 933. Therefore, the second prong of this test is satisfied.

The evidence is sufficient to support the third prong regarding a causal connection between the protected activity and the adverse employment action, *i.e.,* between the filing of the original sexual harassment complaint with the City and Simpson's constructive discharge. Indeed, the evidence indicates that Chambers and her co-workers expressly linked their threats and retaliatory acts to Simpson's making a sexual harassment complaint against them.

Thus, there was a legally sufficient evidentiary basis for a reasonable jury to find retaliation. We affirm the district court's denial of the Rule 50 motion for judgment as a matter of law with respect to the retaliation claim. Finally, we note that because we affirm the district court's denial of the City's Rule 50 motions, we need not reach the City's challenges to the "lump sum" damages award.

For these reasons, the district court's judgment is AFFIRMED.

11

# *United States Court of Appeals*

**FIFTH CIRCUIT**
**OFFICE OF THE CLERK**

**CHARLES R. FULBRUGE III**
**CLERK**

**TEL. 504-589-6514**
**600 CAMP STREET**
**NEW ORLEANS, LA 70130**

February 1, 2000

Mr Robert H Shemwell, Clerk
Western District of Louisiana, Shreveport
United States District Court
300 Fannin Street
Suite 1167
Shreveport, LA 71101

      No. 98-30935 Simpson v. Shreveport
         USDC No. 97-CV-1234

Enclosed, for the district court only, is a certified copy of the
judgment issued as the mandate.

Enclosed, for the district court only, is a copy of the court's
opinion.

Record/original papers/exhibits to be returned.

                         Sincerely,

                         CHARLES R. FULBRUGE III, Clerk

                         By: _____
                             Shari D. Stewman, Deputy Clerk

cc: (letter only)
    Honorable John M Shaw
    Mr David L White
    Mr S Price Barker
MDT-1